UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FREEMAN INVESTMENT MANAGEMENT CO., LLC, a Delaware Corporation,<br><br>                                   Plaintiff,<br><br>v.<br><br>FRANK RUSSELL COMPANY, a Washington Company, d/b/a RUSSELL INVESTMENT GROUP,<br><br>                                   Defendant. | Case No.: 13-CV-2856 JLS (RBB)<br><br>**ORDER: (1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND (2) DENYING AS MOOT ALL REMAINING MOTIONS**<br><br>(ECF Nos. 133, 134, 154, 159, 160, 253) |

Presently before the Court are the Motion of Plaintiff Freeman Investment Management Co., LLC for Summary Judgment Dismissing Affirmative Defenses of Unclean Hands, Waiver, and Estoppel (Pl.'s MSJ, ECF No. 133); Defendant Frank Russell Company's Motion for Summary Judgment (Def.'s MSJ, ECF Nos. 134, 149 (sealed), 160); Defendant's *Daubert* Motion to Preclude Opinions of Charles Porten and Certain Opinions of Jeffrey Kinrich (Def.'s *Daubert* Mot., ECF Nos. 150 (sealed), 159); the Motion of Plaintiff to Exclude Testimony of Sumanth Addanki and Jeffrey Wurgler (ECF Nos. 154, 158 (sealed)); and Defendant's Objection and Motion to Set Aside Magistrate Judge's Order Granting in Part Defendant Frank Russell Company's CivLR 16.1(f)(1)(B) Motion to Continue Final Pretrial Conference Currently Set for June 9, 2016 (Mot. to Set Aside,

ECF Nos. 250 (sealed), 253). Also before the Court are Defendant's Opposition to (ECF Nos. 179 (sealed), 186) and Plaintiff's Reply in Support of (ECF Nos. 194–95, 208, 218 (sealed)) Plaintiff's MSJ, Plaintiff's Opposition to (ECF Nos. 170–72, 180 (sealed), 184) and Defendant's Reply in Support of (ECF Nos. 209–10, 219 (sealed)) Defendant's MSJ, Plaintiff's Opposition to (ECF Nos. 178 (sealed), 185) and Defendant's Reply in Support of (ECF Nos. 211, 220 (sealed)) Defendant's *Daubert* Motion, Defendant's Opposition to (ECF Nos. 177 (sealed), 187) and Plaintiff's Reply in Support of (ECF Nos. 189–91) Plaintiff's *Daubert* Motion, and Plaintiff's Opposition to (ECF Nos. 256, 260 (sealed)) and Defendant's Reply in Support of (ECF Nos. 264 (sealed), 266) Defendant's Motion to Set Aside, as well as the Notice of Plaintiff of Lodging of PowerPoint Slides Presented and Tendered to the Court at August 18, 2016, Hearing on Defendant's MSJ (ECF Nos. 270, 275 (sealed)); the Notice of Plaintiff of Election of Trade Secrets (Election, ECF No. 276); and Defendant's Response and Objection to Plaintiff's Election (Obj., ECF No. 278).

The Court vacated the hearings on Plaintiff's MSJ, the parties' *Daubert* Motions, and Defendant's Motion to Set Aside (ECF Nos. 265, 268), but held a hearing on Defendant's MSJ on August 18, 2016 (ECF Nos. 269, 277). Having considered the parties' arguments and the law, the Court **GRANTS** Defendant's MSJ (ECF Nos. 134, 160) and **DENIES AS MOOT** Plaintiff's MSJ (ECF No. 133), Defendant's *Daubert* Motion (ECF No. 159), Plaintiff's *Daubert* Motion (ECF No. 154), and Defendant's Motion to Set Aside (ECF No. 253).

**BACKGROUND**

**I.   Factual Background**

John Freeman, who has worked in the field of investment management and research for over twenty-five years, founded Plaintiff in 2008. (First Am. Compl. (FAC) ¶¶ 5–6, ECF No. 18.) Prior to and after founding Plaintiff, Mr. Freeman did significant research in the area of investment strategies. (*Id.* at ¶ 7.)

In 2008, MSCI Barra launched a set of indices based on volatility, the MSCI Global Minimum Volatility Indexes. (*See* Decl. of Eric B. Evans (Evans Decl.) Ex. 21, ECF No.

149-23.)  The indices were "designed to reflect a minimum-variance or managed volatility equity strategy that focuses on absolute return and volatility."  (*Id.*)  This high-low volatility approach was "based directly on a 2007 article by Blitz and van Vliet that uses a global large cap sample" (*id.*), which "present[ed] empirical evidence that stocks with low volatility earn high risk-adjusted returns" (Evans Decl. Ex. 114A pt. 1 at 204, ECF No. 149-119 at 8[1]).  Such "'[l]ow volatility investing' ha[d] been an explicit or implicit subject of interest for academics ever since the introduction of" key theories in the 1950s and 1960s.  (*See* Evans Decl. Ex. 108 ¶ 31, ECF No. 149-110 at 17.)  Moreover, "[m]ultiple authors [in 2006 and 2007] . . . ha[d] shown that equities with low volatility have tended to outperform equities with high volatility and, contrary to the [capital asset pricing model (CAPM)] predictions, the market as a whole."  (*Id.* at ¶ 32.)  Mr. Freeman, however, believed the MSCI index to be insufficient, as some institutions were reluctant to incorporate volatility-based strategies due to lack of benchmarks for performance measurement.  (*See* Evans Decl. Ex. 108 ¶ 38, ECF No. 149-110 at 20; *see also* Decl. of Benjamin J. Everton (Everton Decl.) Ex. G at 135:3–9, ECF No. 180-3 at 143.)

In May 2009, as an employee and the CEO of Plaintiff, Mr. Freeman began to develop a set of Volatility Style Indices.  (*See* Decl. of John Freeman (Freeman Decl.) ¶¶ 1, 5, ECF No. 170.)  Mr. Freeman ultimately drafted a white paper entitled "Divide and Conquer: A More Efficient Approach to Equity Style" (the White Paper).  (*See, e.g.*, Evans Decl. Ex. 3, ECF No. 149-5.)  Broadly speaking, the White Paper "show[ed] how partitioning equity volatility allows investors to buil[d] asset mixes which are less convex, relying not on a combination of unrealistically high expected returns from speculative equities in combination with high levels of safety from long-dated government debt."  (*Id.* at 4.)

/ / /

---

[1] Pin citations to docketed materials refer to the CM/ECF page numbers electronically stamped at the top of each page.

Both before and after formulation of the White Paper, Mr. Freeman discussed his volatility-based style indices with a number of current or prospective clients. (*See, e.g.*, Evans Decl. Exs. 4–5, ECF Nos. 149-6–7 (indices emailed to John Meier of Strategic Investment Solutions (SIS) in June 2009); Evans Decl. Ex. 58, ECF No. 149-60 (July 2009 email to Bineer Bhansali of PIMCO concerning "proposal for volatility-based style indexes"); Evans Decl. Ex. 73, ECF No. 149-75 (May 2009 meeting with Chris Li, CIO of Lockheed, regarding "some of our research on volatility" and recommending an "asset allocation . . . of low volatility/high quality equities"); Evans Decl. Ex. 74, ECF No. 149-76 (October 2009 meeting with Lockheed "present[ing] the Volatility Indexes pitch"); Evans Decl. Ex. 75, ECF No. 149-77 (June 2009 meeting with Mr. Meier of SIS regarding the "Volatility Matrix"); Evans Decl. Exs. 76–77, 82, ECF Nos. 149-78–79, 149-84 (August 2009 presentation to Kevin Britton of Cornell entitled "Volatility Indexes: Capital Creation and Destruction"); Evans Decl. Ex. 78, ECF No. 149-80 (January 2009 email to danc@jslocum.com concerning a meeting about Plaintiff's Volatility Matrix); Evans Decl. Ex. 79, ECF No. 149-81 (March 2009 email to Mahendra Shah of PacifiCorp. Regarding Plaintiff's Volatility Matrix and attaching a *Freeman Overview*); Evans Decl. Ex. 80, ECF No. 149-82 (March 2009 email to Richard F. Grannis of Qualcomm regarding Plaintiff's Volatility Matrix and attaching a *Freeman Overview*); Evans Decl. Ex. 81, ECF No. 149-83 (May 2009 email to Ron Adelhelm of Tarsadia attaching an Overview and "a presentation on Efficient Value (EV) which is our large cap low volatility strategy"); *see also* Evans Decl. Ex. 103 at 293:18–294:14, ECF No. 149-105 at 31–32 (identifying the presentation sent to Mr. Britton at Cornell as "a prelude to the concepts that were in the white paper"); Evans Decl. Ex. 100 at 88:17–22, ECF No. 149-102 at 8 (defining Plaintiff's "volatility matrix" as "the secret sauce that – that Freeman had – that used in its own stock picking").) No mention of confidentiality is made in any of these communications. (*See id.*)

Mr. Freeman's volatility style indices were "very important for [Plaintiff's] business." (*See* Evans Decl. Ex. 55, ECF No. 149-57.) To "monetize" this intellectual

property, Plaintiff formulated a list of five firms that could help develop indices based on Mr. Freeman's work. (*See* Evans Decl. Ex. 52, ECF No. 149-54.)  Although PIMCO was at the top of Plaintiff's list, it ultimately suggested that Plaintiff create its own index, which Plaintiff was hoping to avoid through a partnership. (*See id.*)  Consequently, Plaintiff approached Defendant. (*See id.*)

On November 11, 2009, Mr. Freeman spoke with Mary Fjelstad, a senior research analyst at Defendant. (*See* Evans Decl. Ex. 1, ECF No. 149-3; Evans Decl. Ex. 3, ECF No. 149-4.)  In an e-mail to other employees of Plaintiff, Mr. Freeman memorialized the conversation:

> Spoke with Mary about her request to co-author a paper comparing the Russell indices with the S&P index family . . .
>
> Had a confidential chat about the VSI.  Russell is working on a 'Stability' Index within the research group.  They are definitely tuned in to the whole vol/quality issue.  Still, they have not done comprehensive look.  Went through a bunch of the logic and Mary liked it. . . .
>
> She said we should get an NDA to her ASAP so it could work through the legal channels.  She is keen to get us connected with her boss Rolf Agather.

(Evans Decl. Ex. 3, ECF No. 149-4.)  On November 17, 2009, Mr. Freeman emailed Ms. Fjelstad a copy of the White Paper. (*See* Evans Decl. Exs. 1–2, ECF Nos. 149-3–4.)  The e-mail had the subject line "here's the paper," and Mr. Freeman indicated in the body of the e-mail that he "ha[d] not had a chance to finish the NDA but w[ould] do so tomorrow." (*Id.*)

On December 1, 2009, Mr. Freeman met Rolf Agather, head of Defendant's index group, for lunch. (Freeman Decl. Ex. ZZ, ECF No. 170 at 7.)  They "talked extensively about style and since [they did]n't have an NDA in place, [Mr. Freeman] tried to set the table for future discussions by laying out [Plaintiff's] perspective on investing without explicitly discussing the VSI."  (*Id.*)

On December 8, 2009, Mr. Freeman followed up with Mr. Agather, informing him that "[o]nce the NDA has been consummated, we'd be happy to come up to Tacoma for further discussions." (Freeman Decl. Ex. AAA, ECF No. 170 at 11.)  Mr. Agather "agree[d] on the need for an NDA." (*Id.*)  Defendant sent a copy of the fully executed NDA agreement to Mr. Freeman on December 17, 2009. (*Id.* at 9, 13; *see also* Evans Decl. Ex. 7, ECF No. 149-9.)

The NDA provided that "[t]he receiving party shall not disclose any Confidential Information to third parties for five (5) years . . . ." (Freeman Decl. Ex. AAA, ECF No. 170 at 13; Evans Decl. Ex. 7, ECF No. 149-9 at 2.)  The NDA excluded from the definition of Confidential Information various categories, including information that:

> (i) entered or subsequently enters the public domain without the receiving party's breach of any obligation owed to the disclosing party; (ii) became known to the receiving party prior to the disclosing party's disclosure of such information to the receiving party; (iii) became known to the receiving party from a source other than the disclosing party without a breach of an obligation of confidentiality owed to the disclosing party; (iv) is disclosed by the disclosing party to a third party without restrictions on its disclosure; or (v) is independently developed by the receiving party.

(*Id.*)

Between January and May 2010, Freeman "reached out to about 80 contacts with the VSI." (Evans Decl. Ex. 55, ECF No. 149-57; *see also* Evans Decl. Exs. 53–54, ECF Nos. 149-55–56; Evans Decl. Ex. 102 at 232:4–6, ECF No. 149-104 at 40.)  Plaintiff did not have NDAs in place with respect to any recipients of the White Paper other than Defendant. (*See* Evans Decl. Ex. 102 at 228:17–22, ECF No. 149-104 at 36.)  Roger Evans of Greylock Partners and Mr. Johnson emailed several recipients a "heads up" that they would be receiving a copy of the White Paper from Plaintiff and soliciting feedback. (*See* Evans Decl. Exs. 63, 65, 67, ECF Nos. 149-65, 67, 69.)  None of these emails mentioned confidentiality. (*See id.*)  At least one recipient who received such an email "do[es] not recall receiving a telephone call or any other correspondence from [Plaintiff] at any time

requesting that the White Paper by kept confidential." (Decl. of Matthew Dmytryszyn ¶¶ 3–4, ECF No. 149-128.)  Moreover, because "[i]n [his] experience, that type of call or correspondence would be unusual, . . . [he] would be likely to remember . . . ." (*Id.* at ¶ 4.)

All circulated drafts of the White Paper did contain a legend on the cover identifying it as "Confidential: Please Do Not Cite or Circulate Without Permission of the Author," with each subsequent page labeled "Confidential." (*See* Evans Decl. Ex. 3, ECF No. 149-5 (Draft 1); Freeman Decl. Ex. BBB, ECF No. 170 at 16–90 (Draft 1a); Freeman Decl. Ex. CCC, ECF No. 170 at 92–165 (Draft 2).)  The final page in each draft also cautioned that "[n]one of the information contained in this paper may be copied, duplicated, or distributed to any third party without express written consent of Freeman." (*See* Evans Decl. Ex. 3, ECF No. 149-5 at 76 (Draft 1); Freeman Decl. Ex. BBB, ECF No. 170 at 90 (Draft 1a); Freeman Decl. Ex. CCC, ECF No. 170 at 165 (Draft 2).)  Four of the six electronic versions were sent with password protection. (*See* Evans Decl. Ex. 54, ECF No. 149-56.)

Mr. Freeman later testified at his deposition that "no one got the paper unless [Peter Johnson, an employee of Plaintiff, or Mr. Freeman himself] talked to them in advance and explicitly got them to agree to . . . maintain confidentiality.  No one."[2] (Evans Decl. Ex. 94 at 82:15–16, ECF No. 149-96 at 8.)  Mr. Freeman continues to maintain that all disclosures were confidential:

> Any disclosure relating to the [Volatility Style Indices] . . . was
> to trusted individuals interested in volatility-based investing, and

---

[2] Plaintiff argues in its Opposition that "the only Russell employee to receive the WP from Freeman before the NDA [i.e., Ms. Fjelstad] admitted that she received a call and kept the WP confidential." (Def.'s MSJ Opp'n 29, ECF No. 180 (citing Everton Decl. Ex. C at 33:10–13, 413–20, ECF No. 180-3 at 72, 77).) While technically true, this wording is misleading and the argument is not well taken.  Upon review of Ms. Fjelstad's deposition testimony, Ms. Fjelstad testified that she kept the White Paper confidential. (*See* Everton Decl. Ex. C at 33:10–19, ECF No. 180-3 at 72.)  Ms. Fjelstad later testified that "in November of 2009, I had a, you know, I had a telephone call with John Freeman, the purpose of which was to talk about whether or not we were going to go forward with trying to do a paper on this. And – and in that particular call, he mentioned, you know, that he might have an idea for an index product." (Everton Decl. Ex. C at 73:6–12, ECF No. 180-3 at 77.)  Ms. Fjelstad may have received a call from Mr. Freeman and may—out of professional courtesy—kept the White Paper confidential, but those separate facts together do not mean that Mr. Freeman called Ms. Fjelstad before her receipt of the White Paper to request that she keep it confidential as Plaintiff implies.

the circumstances were, by necessity, highly confidential.  Past practice, industry norms, and my and Pete Johnson's personal knowledge of the character of the relevant people and firms all indicated that they knew of, and would not violate, [Plaintiff]'s confidentiality expectations.  None of the people or organizations in [Defendant's exhibits] had the slightest inclination to launch indexes because it was outside of their business models and would require extraordinary effort.

(Freeman Decl. ¶ 5, ECF No. 170.)  While Mr. Johnson could not recall placing any calls to recipients of the White Paper, "[his] sense is – is we called them."  (Evans Decl. Ex. 102 at 228:23–229:19, ECF No. 149-104 at 36–37; Evans Decl. Ex. 102 at 230:13–22, ECF No. 149-104 at 38.)

During this same period, the White Paper was also discussed with prospective clients.  On January 19, 2010, Messrs. Freeman and Johnson presented the volatility index contained in the White Paper to over twenty employees of the Virginia Retirement System (VRS).  (*See* Evans Decl. Ex. 72, ECF No. 149-74; Evans Decl. Ex. 102 at 110:18–111:17, ECF No. 149-104 at 9–10.)  Prior to the meeting, VRS's Director of Global Equity requested "an electronic copy of [the White Paper] to share with VRS staff only."  (Evans Decl. Ex. 68, ECF No. 149-70 at 2.)  At Mr. Freeman's request, one of Plaintiff's employees forwarded an electronic version of the White Paper to two separate VRS employees, making no mention of confidentiality.  (*Id.*)  Following the meeting, VRS was granted permission to use the White Paper as a reference in a literature review.  (*See* Evans Decl. Ex. 71, ECF No. 149-73; Evans Decl. Ex. 101 at 158:9–12; ECF No. 149-103 at 14.)  VRS also kept the PowerPoint slides from Plaintiff's presentation in a library open to its entire investment department.  (*See* Evans Decl. Ex. 101 at 149:12–150:6, ECF No. 149-103 at 12–13.)

Meanwhile, Plaintiff continued to pursue Defendant.  On January 11, 2010, Messrs. Freeman and Johnson met with Ms. Fjelstad and Mr. Agather.  (Evans Decl. Ex. 52, ECF No. 149-54.)  The following day, they met again with Ms. Fjelstad and Mr. Agather, as / / /

well as Erik Anderson and David Cariño.  (*Id.*)  Mr. Johnson "felt it was a good introduction with genuine interest on [Defendant's] part."  (*Id.*)

On January 22, 2010, Plaintiff held a teleconference with Defendant "to get feedback on [Plaintiff's] research (paper) and the meeting [Messrs. Freeman and Johnson] had with them earlier last week."  (Evans Decl. Ex. 9, ECF No. 149-11.)  Mr. Agather "expressed his interest to keep the ball rolling" and indicated that he would "assign someone to work with [Plaintiff] on the research needed to further confirm the investment merit of volatility."  (*Id.*)

In early February, Barry Feldman, an employee of Defendant, compared Plaintiff's index to "a 50-50 low volatility index" and Defendant's own Russell 1000 Defensive Index.  (*See* Evans Decl. Ex. 11, ECF No. 149-13.)   Although Plaintiff's index outperformed the 50-50 low volatility index, it was "soundly outperformed" by Defendant's own index.  (*Id.*; *see also* Evans Decl. Ex. 23, ECF No. 149-14.)  During that same time period, the parties tentatively agreed to split revenue either 80/20 if Defendant "control[led] all aspects, except for some recognition of [Plaintiff's intellectual property]," or 50/50 if Plaintiff was "active in the distribution."  (Everton Decl. Ex. X, ECF No. 180-3 at 507.)

On April 15, 2010, Defendant informed Plaintiff that it would be focusing on its own stability indices instead of Plaintiff's volatility style indices.  (Everton Decl. Ex. J, ECF No. 180-3 at 216.)  As a result, Plaintiff began to doubt market interest in its volatility research and the board decided to stop funding Plaintiff.  (Freeman Decl. ¶ 3, ECF No. 170.)  Had Plaintiff's board known that Defendant's stability project would use long-term volatility, emphasize volatility, and be launched as a comprehensive broad market style index with higher and lower volatility portions, however, the board would have continued to fund Plaintiff through at least 2011.  (*Id.* at ¶ 4.)

In 2011 Defendant publicly announced its new stability indices, including the Russell 1000 Defensive Index.  (*See generally* Evans Decl. Ex. 107, ECF No. 149-107; *see also id.* at 78; Freeman Decl. ¶ 6, ECF No. 170.)  Mr. Freeman claims that he recognized

Defendant's indices as containing his prior work.  (Freeman Decl. ¶ 6, ECF No. 170.)  But as Defendant had informed Plaintiff initially (*see, e.g.*, Evans Decl. Ex. 6, ECF No. 149-8; Evans Decl. Ex. 9, ECF No. 140-11), Defendant had also been working on its own volatility-based indices since early-mid 2008 (*see* Evans Decl. Ex. 15, ECF No. 149-17; Evans Decl. Ex. 21, ECF No. 149-23, Evans Decl. Exs. 26–27, ECF Nos. 149-28–29), over a year before Plaintiff first contacted Defendant in November 2009.  In March 2009, over six months before Plaintiff contact Defendant, Dave Hintz prepared a research note announcing Defendant's creation of prototype indices using four equally weighted subcomponents, including three-year total volatility.  (*See* Evans Decl. Ex. 32, ECF No. 149-34.)  About a week before Mr. Freeman reached out to Ms. Fjelstad, Mr. Feldman noted that "[v]olatility is a potential stand-alone index and it is an element of the stability index that [Defendant is] working on." (Evans Decl. Ex. 33, ECF No. 149-35.)  Mr. Hintz replied:

> Volatility is a component of the prototype Stability indices, but my original idea was actually a Quality index.  It morphed into being called Stability as I worked with Barry.  It includes business quality/stability in addition to price volatility.  Our prototype is as much about quality as it is about volatility, so I was to be careful not to have it pigeon holed as just another variety of volatility index.

(*Id.*)

Sometime in April 2010—a few months after Plaintiff began its discussions with Defendant—Defendant's new stability index increased the weight of volatility factors from 25% to 50% and changed from a three-year measure of volatility to both five-year and twelve-month measures of volatility.  (*See* Evans Decl. Ex. 48, ECF No. 149-50; Evans Decl. Ex. 107, ECF No. 149-109 at 79; Everton Decl. Ex. RR at 874, ECF No. 180-5 at 29.)  Plaintiff's demonstrative pictorially depicts the change between Defendant's March 2009 prototype and April 2010 Russell 1000 Defensive Index as follows:

/ / /

/ / /



Exhibit 32

E.g., Exs. 48, RR, 107

(ECF No. 275 at 25.)

On February 2, 2012, Plaintiff filed a patent application titled "System and Method for Volatility-Based Characterization of Securities." (Evans Decl. Ex. 112, ECF No. 149-14.) The Information Disclosure Statements submitted in July and August 2012 included three drafts of the White Paper and hundreds of Plaintiff's internal emails related to discussions of the White Paper with both PIMCO and Defendant. (*See* Evans Decl. Exs. 87–90, ECF Nos. 149-89–92.) In discussing the White Paper, the information disclosure statement noted that it was only ever distributed confidentially:

> References Nos. 24, 25, and 26 are three drafts of a "white paper" prepared by the application, which was clearly labeled: "Confidential: Please Do Not Cite or Circulate Without Permission of the Author." The white paper was prepared for the purpose of receiving the views, opinions and feedback of applicant's colleagues. As indicated in the list provided in Reference No. 27, at least one draft of the white paper drafts was confidentially distributed to the applicant's colleagues on the

11

dates indicated.  Each draft was protected with its own password. Each recipient also received a phone call that emphasized the confidentiality of the white paper.  Each recipient agreed to maintain confidentiality.   References Nos. 28 and 29 are confidential presentations that were prepared for confidential follow-up meetings with the recipients where the confidential white paper was discussed.

(Evans Decl. Ex. 87, ECF No. 149-89 at 2.)  The application was published on July 25, 2013.  (Evans Decl. Ex. 86, ECF No. 149-88; *see also* Evans Decl. Ex. 113, ECF No. 149-115.)

## II.    Procedural Background

On December 6, 2013, Plaintiff filed a complaint alleging six causes of action for trade secret misappropriation, breach of contract, breach of the implied covenant of good faith and fair dealing, breach of confidence, fraud, and constructive fraud.  (*See generally* ECF No. 1.)  The Court dismissed Plaintiff's fourth, fifth, and sixth causes of action on June 23, 2014.  (*See* ECF No. 17.)

Plaintiff filed the operative FAC on July 7, 2014, alleging its original causes of action except breach of confidence.  (*See generally* ECF No. 18.)  On December 11, 2014, the Court dismissed Plaintiff's constructive fraud claim without prejudice.  (*See* ECF No. 28.)  Plaintiff never filed a second amended complaint.  Defendant filed its answer on January 16, 2015, raising unclean hands, waiver, and estoppel as affirmative defenses.  (*See* ECF No. 31.)

On May 15, 2015, Plaintiff served on Defendant its trade secret disclosure under California Civil Procedure Code § 2019.210 (Section 2019.210).  (*See* Evans Decl. ¶ 111, ECF No. 149-2; Evans Decl. Ex. 110, ECF No. 149-112.)  The initial Section 2019.210 disclosure was 110 pages and contained 500 paragraphs of allegedly misappropriated trade secrets.  (*See generally* Evans Decl. Ex. 110, ECF No. 149-112.)

On June 1, 2015, Defendant's counsel emailed a letter to Plaintiff's counsel claiming that "Plaintiff's Identification [of Trade Secrets] falls well-short of the 'reasonably particularly' standard for identification under . . . § 2019.210" and generally outlining "a

number of obvious deficiencies." (Evans Decl. Ex. 104, ECF No. 149-106 at 2.)  Defendant requested that Plaintiff "amend its identification by Friday, June 5, 2015 to address these defects" "to allow the defendant to 'reasonably prepare its defenses and search for art in the field.'"  (Evans Decl. Ex. 104, ECF No. 149-106 at 6–7.)

On June 15, 2015, Plaintiff sent Defendant a supplemental identification of trade secrets pursuant to Section 2019.210.  (*See* Evans Decl. ¶ 112, ECF No. 149-2; Evans Decl. Ex. 111, ECF No. 149-113.)  The supplemental identification was 108 pages and contained 492 paragraphs of allegedly misappropriated trade secrets.  (*See generally* Evans Decl. Ex. 111, ECF No. 149-113.)  Consequently, Defendant moved to strike Plaintiff's trade secret disclosure under Section 2019.210 (*see* ECF No. 49), arguing that "[Plaintiff]'s submissions fall well-short of Section 2019.210's 'reasonable particularity' standard" (*id.* at 4) and that Defendant should therefore be "protect[ed] . . . from discovery . . . unless and until [Plaintiff] makes a reasonably particular identification of trade secrets" (*id.* at 5–6). The motion was referred to Magistrate Judge Brooks.  (*See* ECF No. 53.)

On July 30, 2015, Magistrate Judge Brooks denied Defendant's motion to strike. (*See* ECF No. 56.)  In so doing, Magistrate Judge Brooks held that "section 2019.210 . . . conflicts with Rule 26 . . . .  Accordingly, section 2019.210 does not apply to this action . . . ." (*Id.* at 7.)

On January 7, 2016, Defendant moved for leave to amend its answer to modify its affirmative defenses (*see* ECF No. 86) and on February 4, 2016, Defendant moved to continue the final pretrial conference set for June 9, 2016, as well as for modification of the CMO to extend the discovery cut-off and other pre-trial dates (*see* ECF No. 125).

On March 4, 2016, the parties filed the instant MSJs and Defendant filed its instant *Daubert* Motion.  (*See* ECF Nos. 133, 134, 139.)  Plaintiff did not file its *Daubert* Motion until March 18, 2016.  (*See* ECF No. 153.)  Because Defendant moved to dismiss for lack of jurisdiction under Rule 12(b)(1) on April 1, 2016 (*see* ECF No. 173), however, the Court vacated the hearing on the instant MSJs and *Daubert* Motions pending resolution of Defendant's jurisdictional challenge (*see* ECF No. 181).

On April 28, 2016, Magistrate Judge Brooks granted in part and denied in part Defendant's motion to continue the pretrial conference. (*See* ECF No. 225.) Defendant moved *ex parte* to continue the final pretrial conference and vacate all pretrial deadlines on May 3, 2016. (*See* ECF No. 227.) The Court vacated the pretrial conference on May 16, 2016 (*see* ECF No. 245), and thereafter Magistrate Judge Brooks vacated all remaining case management deadlines (*see* ECF No. 246).

On May 23, 2016, Defendant filed the instant Motion to Set Aside, challenging Magistrate Judge Brooks' April 28, 2016 Order. (*See* ECF No. 253.) Following the Court's denial of Defendant's motion to dismiss and motion to amend its answer on July 18, 2016 (*see* ECF No. 267), the Court reset Defendant's MSJ for a hearing on August 18, 2016 (*see* ECF No. 267 at 12; ECF No. 268.)

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.   Legal Standard

Summary judgment is appropriate where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. The moving party may meet this burden by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that show an absence of dispute regarding a material fact. *Id.* When a party seeks summary judgment as to an element for which it bears the burden of proof, "it must come forward with evidence which would

entitle it to a directed verdict if the evidence went uncontroverted at trial." *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial. *Celotex*, 477 U.S. at 324. This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256. While "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment, . . . summary judgment is not warranted if a reasonable jury could return a verdict for the nonmoving party." *United States v. Arango*, 670 F.3d 988, 992 (9th Cir. 2012) (emphasis in original) (quoting *Anderson*, 477 U.S. at 247–48) (internal quotation marks omitted).

## II. Analysis

Plaintiff alleges four surviving causes of action: (1) trade secret misappropriation, (2) breach of contract, (3) breach of the implied covenant of good faith and fair dealing, and (4) fraud. (*See* FAC ¶¶ 50–88, ECF No. 18; ECF No. 28 at 11 & n.4.) Defendant argues that it is entitled to summary judgment on all of Plaintiff's remaining claims or, alternatively, partial summary judgment on various of Plaintiff's claimed damages. (*See* Def.'s MSJ Mem. 42, ECF No. 149.)

### A. First Cause of Action: Trade Secret Misappropriation

Defendant argues that Plaintiff's trade secret cause of action fails on several independent grounds. Specifically, Defendant claims that Plaintiff has failed to identify a

trade secret with the requisite particularity (*id.* at 21–25), cannot show the existence of a trade secret because Plaintiff's ideas were generally known both in the industry and to Defendant (*id.* at 26–29) and were not kept secret (*id.* at 29–32), and cannot show misappropriation (*id.* at 32–37).

"[A] plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993) (citing *Universal Analytics Inc. v. MacNeal-Schwendler Corp.*, 707 F. Supp. 1170, 1177 (C.D. Cal. 1989), *aff'd*, 914 F.2d 1256 (9th Cir. 1990); *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 250–53 (1968)). "The plaintiff 'should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade.'" *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164–65 (9th Cir. 1998) (alteration and emphasis in original) (quoting *Universal Analytics*, 707 F. Supp. at 1177); *see also nSight, Inc. v. PeopleSoft, Inc.*, 296 Fed. App'x 555, 560–61 (citing *Advanced Modular Sputtering, Inc. v. Super. Ct.*, 132 Cal. App. 4th 826, 835–36 (2005) (defining the "reasonable particularity" element to mean that "the plaintiff must make some showing that is reasonable, i.e., fair, proper, just, and rational under all of the circumstances to identify its alleged trade secret")) (unpublished). "When a party fails to identify its trade secrets with particularity, summary judgment is appropriate." *W.L. Gore & Assocs., Inc. v. GI Dynamics, Inc.*, 872 F. Supp. 2d 883, 899 (D. Ariz. 2012) (citing *Imax*, 152 F.3d at 1166).

Defendant has repeatedly challenged the sufficiency of Plaintiff's identification of its allegedly misappropriated trade secrets throughout this litigation. Defendant first objected to the adequacy of Plaintiff's identification at the infancy of this action in its first motion to dismiss. (*See* ECF No. 10-1 at 12–14.) At that point the Court disagreed, concluding that Plaintiff's "allegations adequately give defendants reasonable notice of the issues, which is all that is required at the pleading stage." (ECF No. 17 at 9–10 (quoting *Farhang v. Indian Inst. of Tech., Kharagpur*, C-08-02658 RMW, 2010 WL 2228936, at

*13 (N.D. Cal. June 1, 2010)) (internal quotation marks omitted).)  In so ruling, the Court declined to address the applicability of § 2019.210, which pertains to discovery and not—as was relevant at the motion to dismiss stage—the pleadings.  (*See id.* at 9.)

Defendant again raised the issue at the onset of discovery, when Plaintiff served on Defendant its identification of trade secrets pursuant to § 2019.210.[3]  (*See* Evans Decl. Ex. 110, ECF No. 149-112.)  Plaintiff's initial identification was 110 pages and contained 500 paragraphs of allegedly misappropriated trade secrets.  (*See id.*)  On June 15, 2015, Defendant moved to strike Plaintiff's identification as non-compliant with § 2019.210. (*See* ECF Nos. 46, 49.)  While the motion was pending, Plaintiff served a supplemental identification of trade secrets, which was 108 pages and contained 492 paragraphs of allegedly misappropriated trade secrets.  (*See* Evans Decl. Ex. 111, ECF No. 149-113.)  In addition to "portions of, and combinations of, numbered statements and other phrases herein," the supplemental identification included "[t]he trade secrets already described and identified in" various of Plaintiff's filings and this Court's Orders.  (*See* Evans Ex. 111 at ¶ 492, ECF No. 149-113 at 109–110.)  Magistrate Judge Brooks subsequently denied Defendant's motion to strike, holding that § 2019.210 conflicted with Rule 26 to the extent it would limit initiation of discovery, and therefore that provision did not apply to this action.  (*See* ECF No. 56 at 6–7.)

Now on summary judgment, Defendant argues for the third time that Plaintiff has failed to identify a trade secret with particularity, relying primarily on Plaintiff's supplemental § 2019.210 identification, but also Plaintiff's interrogatory responses and deposition testimony.[4]  (*See generally* Def.'s MSJ Mem. 21–25, ECF No. 149.)  Defendant

---

[3] Plaintiff made clear that, "[b]y providing this document, [Plaintiff] does not take a position on whether the requirements of § 2019.210 . . . . legally apply in this proceeding or in the federal courts."  (Evans Decl. Ex. 110, ECF No. 149-112 at 3 n.1.)

[4] For example, in October 2015, Plaintiff identified a variety of Court filings and other documents "identif[ying] and describ[ing]" its trade secrets in response to one of Defendant's interrogatories:

> Freeman's trade secrets . . . are identified and described in at least the
> following documents: (1) Freeman's First Amended Complaint . . . (ECF

13-CV-2856 JLS (RBB)

first notes that the volume of Plaintiff's various purported identifications of its alleged trade secrets "'impermissibly . . . shifts its burden onto [Defendant] (and the Court) to sift through' voluminous documents in order 'to ascertain [its] trade secret.'" (*Id.* at 24 (quoting *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 263 (S.D.N.Y. 2014), *aff'd*, 610 F. App'x 69 (2d Cir. 2015)) (citing *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002); *GlobalTap, LLC v. Elkay Mfg. Co.*, No. 13 C 632, 2015 WL 94235, at *6 (N.D. Ill. Jan. 5, 2015)); *Bunnell v. Motion Picture Ass'n of Am.*, 567 F. Supp. 2d 1148, 1155 (C.D. Cal. 2007).) Defendant also notes that Plaintiff's identifications "us[e] broad and categorical terms" and "subjective and vague descriptions." (*Id.* at 24–25.)

---

> No. 18); (2) Freeman's Opposition to Russell's Motion to Dismiss . . . (ECF No. 25); (3) Order Granting in Part and Denying in Part Defendant's Motion to Dismiss (ECF No. 28); (4) Plaintiff's Supplemental Identification of Trade Secrets . . .; (5) Freeman's Opposition to Frank Russell's Motion to Strike . . . (ECF No. 51); (6) Order Denying Defendant's Motion to Strike . . . (ECF No. 56); and (7) Freeman's Responses to Interrogatories Nos. 4 and 5.

(Evans Decl. ¶ 106, ECF No. 149-2; Evans Decl. Ex. 105, ECF No. 149-107 at 2.)

Similarly, Mr. Johnson testified at his Rule 30(b)(6) deposition when asked to "identify the trade secrets . . . that [Plaintiff] contends [Defendant] used that are contained in [the Court's order on Defendant's motion to dismiss]" that "the essence of the trade secrets are embedded in this entire document." (Evans Decl. Ex. 96 at 75:13–24, ECF No. 149-98 at 7.) Mr. Johnson also testified that he believed there were additional trade secrets that Defendant used or disclosed that were not listed in Plaintiff's supplemental identification of trade secrets, although he could not recall any at that time. (Evans Decl. Ex. 96 at 126:1–127:7, ECF No. 149-98 at 10–11.)

Finally, at Mr. Freeman's Rule 30(b)(6) deposition, he testified as to the broad scope of Plaintiff's alleged trade secrets:

> [W]hat we see here from this document is the trade secret is huge in . . . its scope. And it's not . . . this ingredient, and it's not that ingredient. It's the totality of . . . what's in here. And . . . the people involved. . . .
>
> So . . . is the trade secret this one little part of it? No. . . . [T]he trade secret . . . has 500 dimensions.
>
> . . .
>
> It's hard for . . . me to put the trade secret in a box and say this is the box.

(Evans Decl. Ex. 94 at 169:5–17011, ECF No. 149-96 at 13–14.)

1    Finally, at this late stage in the litigation, the Court is inclined to agree.

2        In the face of Defendant's criticism of its identification of its trade secrets, Plaintiff

3    doubled down in its Opposition that "each numbered paragraph [in the § 2019.210

4    identification] is a trade secret"[5] (Defs.' MSJ Opp'n 17, ECF No. 180 (quoting Defs.' MSJ

5    Mem. 23, ECF No. 149)), explaining that its list of alleged trade secrets "is long because

6    [Plaintiff] provided so much confidential information to [Defendant]—including the 74-

7    page [White Paper]" and that "[t]he fact that the list is long is a testament to the breadth

8    and scope of the factual disputes in this case" (*id.* at 17–18).

9        As the Court informed the parties in its tentative, Plaintiff's identification—which it

10   stood by in the record before the Court at the time—was "overly vague and overly

11   inclusive." (Tr. at 3:11–13, ECF No. 277; *see also IDX Sys. Corp.*, 285 F.3d at 583

12   ("[Plaintiff] has been both too vague and too inclusive, effectively asserting that all

13   information in or about its [White Paper] is a trade secret. That's not plausible—and, more

14   to the point, such a broad assertion does not match up to the statutory definition.").)

15   "Rather than a 'reasonably particular' list of trade secrets, Plaintiff's disclosure resembles

16   an effort to categorize every piece of information or know-how that could potentially have

17   value to the company." *See Loop AI Labs Inc. v. Gatti*, --- F. Supp. 3d ----, 2016 WL

18   3654378, at *5 (N.D. Cal. 2016). As such, Plaintiff failed to "provide 'reasonable notice

19   of the issues which must be met at the time of trial.'" *See Mattel, Inc. v. MGA Entm't, Inc.*,

20   782 F. Supp. 2d 911, 967 (C.D. Cal. 2011) (quoting *Diodes, Inc. v. Franzen*, 260 Cal. App.

21   2d 244, 253 (1968)); *see also Tucson Embedded Sys. Inc. v. Turbine Powered Tech. LLC*,

22   No. CV-14-01868-TUC-BGM, 2016 WL 1408347, at *8 (D. Ariz. Apr. 11, 2016) ("Based

23   upon the evidence put forth by [counterplaintiff], it would appear that it has invested

24

_____

25   [5] Even if Plaintiff had identified its trade secrets with greater particularity in its Opposition, Defendant

26   argues persuasively that "it is too late for FIMCO to cure its failure to meet the particularity standard. A

     party may not supplement an insufficient trade secret disclosure on opposition to summary judgment—it

27   is bound by its earlier descriptions." (Def.'s MSJ Mem. 25, ECF No. 149 (citing *Big Vision*, 1 F. Supp.

     3d at 257-59; *Pixion v. Placeware*, 421 F. Supp. 2d 1233, 1241–42 (N.D. Cal. 2005), *aff'd*, 177 F. App'x

28   85 (Fed. Cir. 2006).)

13-CV-2856 JLS (RBB)

significant time and resources to develop the [alleged trade secrets]; however, [counterplaintiff] has failed to provide enough detail about the alleged trade secrets for [counterdefendant] or this Court to adequately discern what might be legally protectable."). In such circumstances, summary judgment is appropriate. "When a party fails to identify its trade secrets with particularity, summary judgment is appropriate." *See, e.g.*, *W.L. Gore & Assocs.*, 872 F. Supp. 2d at 899 (citing *Imax*, 152 F.3d at 1166).

At the hearing, however, Plaintiff indicated for the first time that it had no intention of going to trial on 492 trade secrets, but instead assumed that it would be permitted to elect "twenty[ or] nine" trade secrets at the final pretrial conference. (Tr. at 9:18–20, 10:8–16, ECF No. 277.)   Plaintiff had never previously disclosed this intention to either Defendant or the Court. (*Id.* at 25:8–27:6, 29:23–30:16.)  In particular, Plaintiff's counsel pointed to trade secrets 60, 193, and 241, as identified in its Supplemental Identification of Trade Secrets. (*Id.* at 11:9–18, 16:7–20:15, 48:1–49:15.)

But even these select trade secrets are not reasonably particular.  Trade secret 60, for example, is "[e]mphasizing volatility (including 60-month trailing volatility) in constructing, using and marketing a broad-market set of market-weighted stock indexes in a style framework." (Evans Decl. Ex. 111, ECF No. 149-113 at 11; *see also* Tr. at 11:15–17, 16:14–16, ECF No. 277.)   As Defendant's counsel noted at the hearing, "saying 'emphasizes' could mean anything . . . . [I]t's devoid of substance" (*id.* at 27:24–28:3). That this trade secret lacks the requisite particularity is illustrated perfectly by Plaintiff's counsel's later attempt to define what it means to "emphasize" volatility: "It doesn't have to be a specific percentage.  There is no – 50 percent is certainly sufficient, 25 is not." (*Id.* at 43:1–5.)  As with a recipe for chocolate cake "emphasizing chocolate," trade secret 60 is vague and, ultimately, unhelpful.  If Plaintiff does not know precisely what its trade secrets are, neither can Defendant or the Court.

/ / /

/ / /

/ / /

To be clear, the Court is not, as Plaintiff suggested at the hearing, confusing "numerosity" with particularity.[6] (*See, e.g.*, *id.* at 47:18–22, 52:7–19, 73:20–74:4.) As the Court indicated at the hearing, "it's not the volume, it's the particularity that matters. But when I see 'emphasizing volatility,' and you're telling me, 'well, it has to be at least this percent,' how do I know that?" (*Id.* at 52:24–53:2.) Consequently, "[i]t wasn't just that you had a lot of precise things that you packaged together . . . . It wasn't just the quantity of them." (*Id.* at 53:20–23.) That some of the 492 purported trade secrets are not sufficiently particular does not mean that none of them are, but it does not distinguish "[t]he cases that [Defendant] has cited . . . where a trade secret proponent sought to say 'oh, it's in here somewhere.'" (*See id.* at 52:12–15; *see also GlobalTap*, 2015 WL 94235, at *7 ("There may well be trade secrets within the 10[8]–page [supplemental identification], but it was Plaintiff's burden to identify those secrets and it ha[d] repeatedly failed to do so.").) That is precisely the situation here, where at least some of the Plaintiff's 492 trade secrets are not sufficiently particular: Plaintiff's failure to identify those trade secrets that really were sufficiently particular does not impose a burden on either the Court or Defendant to do so for it.

Since the hearing, Plaintiff has filed a Notice of Election of Trade Secrets, purporting to identify eight trade secrets for prosecution at trial. (*See generally* ECF No. 276.) Specifically, Plaintiff indicates its intention to pursue trade secrets 60, 74, 193, 241, 261, 368, 447, and 483. (*Id.* at 2.) Plaintiff also notes that "is no longer pursuing any of the remaining trade secrets." (*Id.*) Defendant objects to Plaintiff's Election, urging that it "should have no bearing on this Court's decision . . . ." (Obj. 2, ECF No. 278.)

As noted previously, *see supra* note 5, Plaintiff's attempt to revise its trade secret identification at this stage is simply too little too late. The Court informed Plaintiff at the hearing that "counsel was entitled to know what we were dealing with before now." (Tr.

---

[6] Nor is it the case that the Court—unlike Mr. Freeman, "the folks at [Defendant]," and VRS—simply did not "understand[]" the trade secrets. (*See* Tr. at 72:10–14, ECF No. 277.)

at 53:5–6, ECF No. 277.)   Defendant's counsel aptly summarized why: "We've been through a year and-a-half of this.  We've hired experts.  We've taken depositions, all in the face of a 492-plus trade secret claim.  If they had identified three, the case would look completely different.  We can't start over now."  (*Id.* at 28:25–29:3.)  This conclusion is borne out by the cases cited in Defendant's MSJ briefing and in its Objection.  (*See* Def.'s MSJ Mem. 25, ECF No. 149 (citing *Pixion*, 421 F. Supp. 2d at 1241–42; *Big Vision*, 1 F. Supp. 3d at 257–59); Obj. 2–3, ECF No. 278 (citing same).)  Additionally, not all of the trade secrets in the Election are sufficiently particular: among the trade secrets identified in Plaintiff's Election is trade secret 60, which, as indicated previously, *see supra* pp. 20–21, is too vague to pass muster.

Because Plaintiff has failed to meet its burden of identifying its alleged trade secrets with the requisite specificity, the Court **GRANTS** Defendant's MSJ with respect to Plaintiff's first cause of action.  *See, e.g.*, *nSight*, 296 Fed. App'x at 560–61; *Heinemann v. Computer Assocs. Int'l, Inc.*, 171 F. App'x 704, 708 (9th Cir. 2006) (unpublished); *MAI Sys.*, 991 F.2d at 522; *Imax*, 152 F.3d at 1164–65; *Tucson Embedded Sys.*, 2016 WL 1408347, at *8; *Integral Dev. Corp. v. Tolat*, No. C 12-06575 JSW, 2015 WL 674425, at *4 (N.D. Cal. Feb. 12, 2015); *Universal Analytics*, 707 F. Supp. at 1177.

### B.   Remaining Causes of Action

Defendant contends that Plaintiff's remaining causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud must fail because they are dependent upon proof that Defendant misappropriated trade secrets or confidential information.  (*See generally* Def.'s MSJ Mem. 39, ECF No. 149.)  Alternatively, Defendant argues that Plaintiff's remaining causes of action each fail on the merits.  (*See generally id.* at 40–42.)

The Court agrees that Plaintiff's remaining causes of action are derivative of its trade secret cause of action and therefore **GRANTS** Defendant's MSJ with respect to Plaintiff's second through fourth causes of action.  *See, e.g.*, *QR Spex, Inc. v. Motorola, Inc.*, No. CV 03-6284-JFW(FMOX), 2004 WL 5642907, at *7 (C.D. Cal. Oct. 28, 2004) ("Each of

Plaintiffs' remaining claims for breach of confidential relationship, . . . breach of contract and fraud . . . is dependant [sic] upon Plaintiffs proving that [defendant] improperly used, disclosed or otherwise misappropriated Plaintiffs' trade secrets and/or confidential information.  As set forth in the preceding section, Plaintiffs have not presented the Court with any admissible evidence that [defendant] used, disclosed, or otherwise misappropriated their trade secrets and/or confidential information.  [¶]  Accordingly, the Court finds that there are no genuine issues of material fact and [defendant] is entitled to judgment as a matter of law . . . .").

The Court also agrees that Plaintiff's second through fourth causes of action fail on the merits.  With respect to Plaintiff's second cause of action for breach of contract, Washington law governs pursuant to the NDA.  (*See* ECF No. 17 at 11 n.2; *see also* Freeman Decl. Ex. AAA § 4.3, ECF No. 170 at 13 ("This Agreement shall be construed and controlled by the laws of the State of Washington."); Evans Decl. Ex. 7 § 4.3, ECF No. 149-9 (same).)  Under Washington law, "[a] breach of contract is actionable only if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant."  *Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wash. App. 707, 712 (1995) (citing *Larson v. Union Inv. & Loan Co.*, 168 Wash. 5 (1932); *Alpine Indus., Inc. v. Gohl*, 30 Wash. App. 750 (1981), *review denied*, 97 Wash. 2d 1013 (1982)).

The Court finds persuasive Defendant's arguments that the NDA does not protect the information Plaintiff exchanged with Defendant.  (*See* Def.'s MSJ Mem. 40, ECF No. 149.)  The NDA provides that "[t]he receiving party shall not disclose any Confidential Information to third parties for five (5) years . . . ."  (Freeman Decl. Ex. AAA, ECF No. 170 at 13; Evans Decl. Ex. 7, ECF No. 149-9 at 2.)  The NDA excludes from the definition of Confidential Information several broad categories of information, including information that:

> (i) entered or subsequently enters the public domain without the receiving party's breach of any obligation owed to the disclosing party; (ii) became known to the receiving party prior to the disclosing party's disclosure of such information to the receiving

party; (iii) became known to the receiving party from a source other than the disclosing party without a breach of an obligation of confidentiality owed to the disclosing party; (iv) is disclosed by the disclosing party to a third party without restrictions on its disclosure; or (v) is independently developed by the receiving party.

(*Id.*)

A number of these exclusions apply to the information Plaintiff exchanged with Defendant. For example, Plaintiff filed a patent application in February 2012, which was published in July 2013. (Evans Decl. Ex. 86, ECF No. 149-88; *see also* Evans Decl. Ex. 113, ECF No. 149-115.) Plaintiff's July 9, 2012 Information Disclosure Statement identified three drafts of the White Paper as non patent literature documents. (*See* Evans Decl. Exs. 87–88, ECF Nos. 149-89–90.) Plaintiff's August 31, 2012 Information Disclosure Statement identified hundreds of emails between Plaintiff and Defendant related to "confidential disclosure of the VSI white paper." (*See* Evans Decl. Exs. 89–90, ECF Nos. 149-91–92.) The White Paper and these emails are part of the public record of Plaintiff's patent application. Because this information "subsequently enter[ed] the public domain without [Defendant]'s breach of any obligation owed to [Plaintiff]" (*see* Freeman Decl. Ex. AAA, ECF No. 170 at 13; Evans Decl. Ex. 7, ECF No. 149-9 at 2), it is not Confidential Information protected by the NDA.

Plaintiff counters that "[Defendant] assumes that [Plaintiff]'s patent application discloses the *entirety* of [Plaintiff]'s trade secrets" but "[t]his assumption is false" because "[Plaintiff] also provided information to [Defendant] through in-person meetings and phone calls that were not recorded and therefore could not have been provided to the USPTO." (Def.'s MSJ Opp'n 37, ECF No. 180 (emphasis in original).) "[Defendant] has provided no evidence demonstrating that any particular trade secret is disclosed in [Plaintiff]'s patent application, as is [Defendant]'s burden on summary judgment." (*Id.*)

This misconception has permeated much of Plaintiff's Opposition: that Defendant must individually address each of Plaintiff's trade secrets—whatever they are—to be

entitled to summary judgment.  Not so.  As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  Defendant has carried this burden; Plaintiff has failed to introduce a genuine issue of material fact that there is any particular trade secret covered by the NDA that Defendant used or disclosed in violation of the parties' agreement.

Similarly, there is abundant evidence in the record that Mr. Freeman and others working for Plaintiff "disclosed [the allegedly confidential information] . . . to a third party without restrictions on disclosure" and perhaps that the alleged trade secrets were "independently developed by the receiving party" and "became known to the receiving party prior to the disclosing party's disclosure of such information to the receiving party." (*See, e.g.*, Evans Decl. Exs. 1–2, ECF Nos. 149-3–4; Evans Decl. Exs. 4–5, ECF Nos. 149-6–7; Evans Decl. Ex. 15, ECF No. 149-17; Evans Decl. Ex. 21, ECF No. 149-23, Evans Decl. Exs. 26–27, ECF Nos. 149-28–29; Evans Decl. Exs. 32–33, ECF Nos. 149-34–35; Evans Decl. Exs. 53–54, ECF Nos. 149-55–57; Evans Decl. Ex. 58, ECF No. 149-60; Evans Decl. Ex. 63, ECF No. 149-65; Evans Decl. Ex. 65, ECF No. 149-67; Evans Decl. Ex. 67, ECF No. 149-69; Evans Decl. Ex. 68, ECF No. 149-70 at 2; Evans Decl. Ex. 71–82, ECF Nos. 149-73–84; Evans Decl. Ex. 101 at 149:12–150:6, 158:9–12; ECF No. 149-103 at 12–14; Evans Decl. Ex. 102 at 110:18–111:17, 228:17–22, 232:4–6, ECF No. 149-104 at 9–10, 36, 40.)  These grounds, too, are sufficient to conclude as a matter of law that the information Plaintiff conveyed to Defendant was not protected as Confidential Information under the parties' NDA.

The Court therefore **GRANTS** summary judgment as to Plaintiff's second cause of action for breach of contract.  Consequently, the Court also **GRANTS** summary judgment on Plaintiff's third cause of action for breach of the implied covenant of good faith and fair dealing, as "[t]he duty to cooperate exists only in relation to performance of a specific

contract term." *Badgett v. Sec. State Bank*, 116 Wash. 2d 563, 570, 807 P.2d 356, 360 (1991) (en banc) (citing *Cavell v. Hughes*, 29 Wash. App. 536 (1981); *Long v. T-H Trucking Co.*, 4 Wash. App. 922, 926 (1971)).

Regarding Plaintiff's fourth cause of action for fraud, California law applies and "requires the plaintiff to establish: (1) a knowingly false representation by the defendant; (2) made with intent to deceive or induce reliance by the plaintiff; (3) justifiable reliance by the plaintiff; (4) resulting damages." *Smith v. Allstate Ins. Co.*, 160 F. Supp. 2d 1150, 1152 (S.D. Cal. 2001) (citing *Moore v. Brewster*, 96 F.3d 1240, 1245–46 (9th Cir. 1996); *Wilkins v. NBC*, 71 Cal. App. 4th 1066 (1999)). "Although material facts are known to one party and not the other, failure to disclose them is ordinarily not actionable fraud unless there is some fiduciary relationship giving rise to a duty to disclose," *Weiner v. Fleischman*, 54 Cal. 3d 476, 483 (1991), or "[a]ctive concealment or suppression of facts by a nonfiduciary," *see Hynix Semiconductor Inc. v. Rambus Inc.*, 441 F. Supp. 2d 1066, 1076–77 (N.D. Cal. 2006) (quoting *Vega v. Jones, Day, Reavis & Pogue*, 121 Cal. App. 4th 282, 295 (2004)) (internal quotation marks omitted).

In its Opposition, Plaintiff identifies several alleged misrepresentations, including that Defendant's stability index was an MSCI MinVol "knockoff" as opposed to a volatility style index, misleading Plaintiff about its interest in discussions with Plaintiff, concealing from Plaintiff what its internal researchers were doing with Plaintiff's information, and failing to assign a researcher to "work with" Plaintiff to confirm the investment merit of volatility, among others. (*See* Def.'s MSJ Opp'n 38–39, ECF No. 180.)

A number of these misrepresentations, however, are omissions. As such, Defendant's failure to disclose them is not actionable unless there was some fiduciary relationship between the parties, *see Weiner*, 54 Cal. 3d at 483, or active concealment, *see Hynix Semiconductor*, 441 F. Supp. 2d at 1076–77. With respect to the former test, in dismissing Plaintiff's constructive fraud claim, the Court held that "Plaintiff has failed to allege facts sufficient to show the existence of a fiduciary relationship between [Defendant] and Plaintiff." (ECF No. 28 at 10.) In the face of Defendant's argument that Plaintiff

13-CV-2856 JLS (RBB)

failed to establish this element, Plaintiff raises no genuine issue of material fact that such a fiduciary relationship existed.  *See Celotex*, 477 U.S. at 322.  With respect to the latter test, the Court agrees with Defendant that Plaintiff has not introduced any evidence amounting to active concealment by Defendant.  (*See* Tr. at 65:15–66:20, ECF No. 277.)

Moreover, Defendant introduces evidence that Plaintiff knew from early on that Defendant was working on stability indexes and was "tuned in to the whole vol/quality issue."  (*See* Evans Decl. Ex. 6, ECF No. 149-8.)  Mr. Agather later explained that Defendant's stability indexes "encompass[] volatility, leverage and earning variability."  (*See* Evans Decl. Ex. 9, ECF No. 149-11.)  Defendant also assigned Mr. Feldman to evaluate Plaintiff's volatility style indices.  (*See* Evans Decl. Ex. 97 at 248:3–24, ECF No. 149-99 at 12; Evans Decl. Ex. 95 at 93:2–6, ECF No. 149-97 at 15; Evans Decl. Exs. 10–12, ECF Nos. 149-12–14.)  Accordingly, Plaintiff's fraud claim fails as a matter of law.

Accordingly, the Court **GRANTS** summary judgment in favor of Defendant on Plaintiff's fourth cause of action for fraud.

## REMAINING MOTIONS

At the hearing, the parties agreed that Defendant's Motion to Set Aside (ECF No. 253) has been mooted.  (*See* Tr. at 8:3–12, 24:21–25:7, ECF No. 277.)  Accordingly, the Court **DENIES AS MOOT** Defendant's Motion to Set Aside.  (ECF No. 253.)

The parties disagree, however, as to the fate of all other pending motions, namely, Plaintiff's MSJ (ECF No. 133) and the parties' *Daubert* Motions (ECF Nos. 154, 159).  Plaintiff urges that these "motions should remain on calendar" because "they would all still be relevant and need to be ruled upon." (Tr. at 8:3–17, ECF No. 277.)  Defendant, however, advocates that "all the motions would be mooted . . . [i]f you granted our motion [for summary judgment] . . . , [on] all the claims, [because] there would be nothing left to decide."  (*Id.* at 24:21–25:7.)

The Court agrees with Defendant: the dismissal of all of Plaintiff's surviving causes of action renders moot any determination on Plaintiff's MSJ concerning Defendant's affirmative defenses and the parties' *Daubert* Motions, the resolution of which was not

relevant to disposition of Defendant's MSJ.  Accordingly, the Court also **DENIES AS MOOT** Plaintiff's MSJ (ECF No. 133), Defendant's *Daubert* Motion (ECF No. 159), and Plaintiff's *Daubert* Motion (ECF No. 154).

**CONCLUSION**

In light of the foregoing, the Court **GRANTS** Defendant's MSJ (ECF Nos. 134, 160) and **DENIES AS MOOT** Plaintiff's MSJ (ECF No. 133), Defendant's *Daubert* Motion (ECF No. 159), Plaintiff's *Daubert* Motion (ECF No. 154), and Defendant's Motion to Set Aside (ECF No. 253).  This Order concludes the litigation in this matter.  The Clerk of the Court shall close the file.

**IT IS SO ORDERED.**

Dated:  September 30, 2016

Hon. Janis L. Sammartino
United States District Judge

13-CV-2856 JLS (RBB)